Mr. Serafini and Mr. Lynch as well, is there any reason we can't, Mr. Lynch excuse me, is there any reason we can't deal with both of these patents in a single oral presentation here, could we extend it a couple of minutes? There is no specific reason your honor, they were handed us to different decisions by the board, so we treat them two separate cases. Yes, but is there any reason we can't discuss them as one here? You have a little extra time if you needed to discuss both. Okay, and if we could proceed in that manner, we'll be a little liberal with the time and perhaps address both in your original argument. Please proceed. How do you get by the obviousness finding for either? Okay, as to both patents, Katsiotis teaches paintballs that fill with liquid. So why couldn't you take the Katsiotis II, which is the sphere filled with tear gas, and instead put the Fenida powder in it? Why wouldn't one of skill in the art make that combination to achieve the claim you mentioned? There are three reasons, your honor. The first reason is that Pepper would try just that, but the record shows it did not work. Once the powder, the projector was shot, it would reach a target and would clump from above, but would not create a cloud. The second reason... Would a person of ordinary skill in this art be able to make adjustments rather quickly to make sure that the powder didn't clump, that the ball, the frangible ball, exploded on impact and created the cloud and everything else? Couldn't that be done rather quickly and easily? The court has felt that it would take continuous experimentation, it would be obvious to try, there would be non-design issues, but in no case has the court shown what these non-design issues are, and has shown none of those. And on top of that, on the obvious to try argument, this court has held in several cases, like the Rolls-Royce case first, and the Orton and Cleve case, that to achieve an obvious to try result requires that you give a known number of finite choices to give predictable results. We don't know, certainly not from the board, what these known choices are. We don't know whether they're finite or not, we submit that or not. We want to try all kinds of things. And we don't know the predictable results, because the test performed by Pepperdall produced the opposite result, the clumping of the powder. The Cotzeo, I'm calling it that for short term, it's Cotzeopolis or something, yeah, but that Cotzeo, it mentioned that it uses tear gas. Can't tear gas be a powder? It may be in one specific version. In that case, the Cotzeo almost anticipates, doesn't it? Well, it takes some speculation to make that, Your Honor, because Cotzeopolis not one time talks about powder in his patent. On top of that, the record shows that Mr. Vazor, one of the inventors of Pepperdall patents, talked to Mr. Gibson, who is one of the inventors of Cotzeopolis patents, and Mr. Gibson simply said, we never tried, we don't know how to do it. So I don't think that Pepperdall teaches in that direction. Well, there's a difference, isn't there, between the technical problem of solving how to make the powder not clump and coming up with the idea of putting powder in the ball and shooting it? There is. So your problem really was a technical problem, wasn't it? Well, it was a problem to create the cloud, and develop the timings. It's obvious that if you're going to put powder in the ball, you want it to do that. And so it's a technical problem how to get it to do that, right? It's correct. But the issue is how the technical problem is solved in a non-obvious or obvious manner. That's one of the top issues of this case. We submit that the prior authors didn't teach how to do it. Pepperdall teaches in his patent that it took them to lower the amount of filling the balls within a certain range, between 60% and 95% of the level. But Cotzeopolis doesn't talk about that. Instead, for example, Plateau, which is also in front of the board, says that the ball should make a spin in the air, but the projected energy makes a spin in the air as it travels through the air. Each part will acquire and change the velocity by spinning the air. When the projection impacts the target, the spinning velocity causes the particles to diffuse and create a cloud. This is not what this patent is about. So what this patent is about is what you're saying is a partial fill which prevents cloning. That's correct. That's the heart of the matter. Yeah, because microparticles through the air can compress and explode upon impact. Why wouldn't one of the skill in the art try a 60% full ball at some point? Well… 65%, whatever the range is. I think it's 60 to 95, isn't it? 65, yes. Why wouldn't they try that at some point if they're filling their Cotzeopolis ball with tear gas powder? Well, there's a fine line for the examiner, for the board, between hindsight and obviousness, clearly. And in the prior art, nowhere does it teach to reduce the fill level. The board just says, no, these are an issue. We don't know what these are issues are. We don't know why wouldn't they try that instead of changing, I don't know, spinning the ball like a Cotzeopolis, like, excuse me, Flateau teaches, or using explosive charge like Felita teaches, or whatever else. So we don't find in the prior art any teaching that says, do this as opposed to that. We do find Cotzeopolis saying, spin the ball, don't use a conventional rounded ball like the board is suggesting. The examiner first, and then the director was briefed, cited one specific example from Felita, where they discussed a grenade with small balls, which then, after being exploded, caused the release of these balls. And the director found this, that when this ball would impact the target, then there would be fumes and create a clouded, pepper-boxed flame. This is actually not correct. Felita teaches two different embodiments. It teaches a type of grenade, which again is actuated by an explosive charge, which is either filled with liquid-filled balls or powder-filled balls. Felita says, you fill it with liquid, the liquid will impact the target, and the ball will explode and cause the liquid to expel on the target. But if you use powder, have the grenade explode in the air, if you use the powder, and then put the target in some area, then the target will be affected by the cloud. This is not what these patterns are about. These patterns are about a paper projectile launched in an air gun or a non-fired gun, which creates a cloud and impacts the subject by enveloping the subject. The commercial success of pepper also supports this monotonousness. For example, the record shows that in the first three years of commercial success of this program, they had a 97% sale rate against any offer made to police organizations. In the three years of commercial success of this product, it achieved a larger market share in non-lethal weapons, for example tasers and other available devices. So we believe that the evidence in front of this board today indicates that these patterns are not obvious, but the reasons are discussed. By remembering the commercial success category, some of that success had to be attributed to non-claimed features. You marketed this extensively with magazines and carrying cases and conveniences, not claimed conveniences, which enhanced its marketability. Wouldn't that diminish the effect of commercial success here? Your Honor, it refers to the objection raised by the board about Pepper was selling what's called hotballs, that is, the boss charged me with taking powder and dummy balls charged without him taking powder. Dummy balls mean for training purposes. Clearly, when one puts a weapon in the hands of an officer, he is trained to use the new weapon. And even in that, you only had about 1% of the market, right? I don't have the number in front of me, but it was like 2 or 3%. Even the smallest, it's not like you're controlling the market. Well, we're talking about different markets when we talk about this. Okay. We're talking about non-lethal weapon markets as opposed to total police markets. I think the majority of projectiles purchased by police organizations are lethal projectiles. Conventional projectiles do not count. Again, I don't have the numbers available now, but in the non-lethal market, Pepper had the top market share compared to most everything else in the picture. And even today, so do 5,300 police organizations all over the world for that matter. But back to the argument that I made about the charged or hot versus non-hot balls. They're called red and blue because they're sold in different colors. The claim feature here would be the location of the cloud. So there is a claim feature, which is part of the nexus, the system of projectiles. It's true that some of the balls, again, don't have the irritant within them, but, again, the score we have to assess and we submit that it should be that at least one claim feature is present in the product. Then the nexus doesn't exist. I think the opposing side is the argument that each claim feature should be protected, but we don't make the law to do this. If the court has no further questions, I refer you to the written description. Okay. Do we have to read the written description? Well, written description affects only three claims. If the court finds that the claims are not obvious, then we'd be happy to, you know, we don't need to argue with those papers. There are no key claims. No, but my question is that if we find that if we sustain a more obvious determination, we don't need to read the written description. We don't need to read the written description. We don't believe it will exist. The patent will not be gotten. The paper was just patent rights. Okay. Do you wish me to address this in the written description? No. It's up to you. Yeah. You have a little time. Okay. Briefly, the key issue with the description is whether the creation of this cloud is such that the target would mean that the patent would be unveiled by this cloud after we say that the patent is closed. The director, excuse me, the board has held that we do not provide, the federal does not provide in the patent specific times for cloud diffusion to show that it would expand fast enough to envelop a person's head and torso. We don't believe that is necessary because, of course, a person's field of the art, reading the patent, would understand that the diffusion of the cloud depends on the chart, on the amount of bill, that is 60 to 95 percent, on the speed of shooting or ejection of the pepper ball, on the force of ejection. So these are all adjustable parameters of a person's field of the art within the patent. We are also eager to support your cloud creation. For that reason, we believe that the written description in the terms provide an adequate support for the three claims in respect to the patent question. I am ready to raise the question. Why don't we hear from the government at this point, and then we'll give you ample time to respond. Thank you very much. May it please the court. The claimed invention is to a spherical projectile that's filled with a pepper powder. Katsiopoulos taught a spherical projectile in three different references to a powder with a pepper. Mr. Serafini and Ms. Lynch made much of the fact that they finally figured out that if you reduce the percentage of fill, you get that cloud dispersion that nobody else has come up with. What's wrong with that? Excuse me. Isn't that an unexpected result? They only argued that in terms of claim 22 with the board's analysis that it would have been obvious to try. That's the claim that has the 60 to 95 percent. And what the board found was that Katsiopoulos itself talked about waiting ages. It said that waiting ages can increase the launch. And so it said similarly, one of skill in the art, if they were trying to improve a weight, and similarly change the weight, and one way to do it would be by changing the amount of fill. So the board found that one of skill in the art with Katsiopoulos in hand would have every reason to try different weights or different fills. But there isn't any prior art that suggests partial filling, which is a part of other claims as well, right? It is part of certain claims. Katsiopoulos says filled and sealed. It doesn't say how much it's filled in its diagram. It only shows it partially filled. But there's no prior art that specifically talks about only partial filling. So how do you make your obviousness in the perspective of application? Kind of what I just said is that one of skill in the art, reading the art, would see that there are different weights of projectiles that are known to impart different volumes to it. And so then they would have every reason to try different weights, and one way to try different weights is by adding different amounts of fills. So the experimentation would be part of what one of ordinary skill in the art would want to do? That's correct, that it would not be undue. Okay. Was there anything in the record about experiencing problems of the hours of pumping that didn't reduce the fill? There's nothing in the prior art that says that, but that's what Pepperball says. They said at 100% they would get a clump. Did they provide antidotes or evidence that it was a clumping problem with 100% fill? I assume it's in one of their declarations. I actually am not absolutely positive whether it is in public. But they talk about trying to fill levels. They tried to fill levels. They did try to fill levels. And they came across that they found that the best was between 65% and 75%. Pepperball does admit that having fill gas was one of the main art that created the file history. Padida is not limited to explosive charges. There's an alternative embodiment where it talks specifically about it bursting on impact and not bursting because of an explosion. And then I'll just say something about the secondary consideration evidence. They don't show a nexus. Their commercial success, they don't show in the first one, in the 1137, it would have to be to not nicomide. And in 1138, they would have to have the actual fill levels. There are affidavits of praise from people in law enforcement. But what the board found was that all they talked about was the advantages of putting a powder in a projectile. And that had been done before by both Padida and Padilla. But apparently they were successful? Maybe not in commercial products, but they had certainly taught that if you put a powder in a projectile, it will pop up in your aircraft. Seems to be discussion of failures in the context that Judge Klager was mentioning. Others had failed to make this powder in a partially filled projectile work very well. There was no specific indication that others in the art had failed. What they point to is they hired Mr. Gibson, who was one of the inventors of the Katsiopoulos patent, and they hired him to optimize their manufacturing method. And he said that it would take him 6 to 12 months to come up with fills at a certain price. And so the Pepper Bowl inventor talked to him, but that was about optimizing a manufacturing process. That wasn't that. Where is the affidavit of ceremony with the fill level? I'm not sure, Your Honor. There are two affidavits by... You mean in terms of this, in terms of... Well, I think you described it earlier, that the experiment with the fill level, the final optimization. Where is that described? I actually don't see it. Maybe Mr. Sarkini does. I don't see it in the 1137 Joint Appendix. So the Court has no further questions? I have one question. Oh, okay. So this is in the 1137 Joint Appendix, page 929. Let's assume, for argument purposes, that others had tried to put powder into one of these... make the cloud, that would be effective. And let's assume the inventor in this case, or the inventor in this case, experimented with a variety of fills and other tweaks and succeeded, where no one previously had succeeded. But he did it, he knew what the issues were, he had the ball, he had the powder, he knew the product. But he succeeded. By various experiments and trial and error. At what point do we simply say, thus, it was obvious to try, it was part of experimentation. Or at what point do we say, ah, he has invented something, and how do we tell the difference between that course of conduct? That means simply saying, you know, he was trying different techniques, different ways to do this thing that was already invented by the prior artisan, or he really invented something. How do we know the difference? I think you would have to show that it was unexpected results. And what the experiment found was that pumping of powder is expected and an inherent property. So I would have a hard time finding that he could show that it was unexpected, and that it required some inventive skill for him to actually be able to pin it down. I think anybody with skill in the art would know that if you drop powder, it puffs, and so there would be just the amount of routine experimentation to get there. Would the artist say it was unexpected, really, because that was what he was expecting to have happen? Well, he says it was, in parallel, he says it was unexpected, that he thought a lower fill-a-hole would not get him that, and he found it unexpected that it did. No, I'm not sure about that. Look at bottom line 29. I think that supports what you're saying. He says it may also be intuitive that the powder fill increased, that the powder might In paragraph 18, he says it might seem intuitive that more powder fill would yield a denser powder fill. All right, so that it may also be intuitive that the powder fill increased, that the powder might clump together and not disperse as well as a lesser fill. So he seems to be saying that his own intuition before he started this was that a lesser fill would avoid clumping properly. All right. Thank you, Your Honor. Okay. The Court is adjourned. Thank you. Thank you, Your Honor. Mr. Sheriffman. I have to address some of the issues raised by this Court. It was inconsequential discussion. There is declaration evidence that Petrov did try using a lower fill level of the liquid and it wouldn't work. There's also declaration evidence that they experimented for some time until they came to the unexpected result of creating a cloud by lowering the fill level of the powder. And the Court wishes to address this Court, to appoint this Court to specific declaration evidence. Thank you, Your Honor. Thank you, Your Honor. Thank you so much. Thank you. Okay. In the declaration, Mr. Basil, on pages 1252 to 161 that he amended, in particular, on page 12. In those pages, Mr. Basil discusses that he tried to lower the fill levels of liquid and it wouldn't work. He wouldn't create a large spray as he stated. On page 1255, Mr. Basil said that this discovery would increase the formation of the cloud and lower the levels than it was expected. On pages 1283 to 1284, he talks about his experimentation in achieving this result. Another argument raised previously was that the usual weighting agents, that is, the addition of heavier products to the powder, in this case, to increase the spray of the powder after impact of the target. Pepperbrook has discussed those weighting agents himself in his patent. However, those are the opposite of the effect. He says that if you want to do something heavier, once the projective impacts the target, then the heavier particles sort of pull out and create a finer powder. This is just the opposite. This is reducing the levels. This is counterintuitive because one would think of putting something heavy to do with this pull action as opposed to reducing the fill to make people think that something will spray at all. On top of that, Pepperbrook itself claims its weighting powers. Again, Pepperbrook discussions claims separately weighting agents as opposed to the levels which are two different concepts altogether. The issue with weighting also is the use of non-leave-a-meat as opposed to oil-raising capsicum. For the benefit of history, oil-raising capsicum was used first. Non-leave-a-meat was used later. Oil-raising capsicum is a combination of 27 capsaicin oils, irritating agents, of which a commercial product, oil-raising capsicum, is highly variable in the best procured for suppliers. Non-leave-a-meat is synthesizable synthetically. It has a very high quality level. But that doesn't change the point that we have a projectile. We lower the level. It creates a cloud. There's an irritating component to it. So I believe the connection does exist between the sales and the commercial results of Pepperbrook because, again, the claim feature of the cloud, the irritating agent, is present in all the sold products to the police forces. One other argument raised before was that the deal doesn't necessarily require explosive charges. Lida talks about firearms with a K-84 director, pyrotechnic devices, smoke-producing means, grenades, explosions, and what embodiment is just in capsules discussed in the previous argument. And, again, the key is that Lida says, with this powder, make it explode, make it grenade the projectile explode in the air, and don't have it hit the target. We don't know why she says that, but it goes to Lida. But it could just be, and this is speculation by Lida, that Lida has the same problem as Pepperbrook encountered in hook clamping and powder distribution. These are the key points we wish to rebut. If there's any questions, we'll be happy to address those. Thank you, sir. Thank you all. I think that concludes our hearing.